UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

_____
                                        )
MICHAEL BROWN, JR.; NATHAN COLE;        )
AARON FLOYD; BRANDON HORTON;            )
ERIC MOORE; GREGORY SEAL;               )
MANNY RIVERA; DAN VISCHANSKY;           )
NEAL NIDA; KEVIN SHOFNER;               )
SHAUN STOCKTON; KYRAN ADAMS;            )
CODY PIPER; JOHN GABLE;                 )
DONNA TURBVILLE; JOHN WILTERDING;       )
and RICHARD PADILLA; individually,      )
on behalf of themselves and             )
all others similarly situated;          )
                                        )
                    Plaintiffs,         )
                                        )
        v.                              )        CIVIL ACTION
                                        )        NO. 3:18-01263-WGY
J&W GRADING, INC.; MIGO IQ, INC.;       )
RADAR_APPS, INC.; ECO IQ LLC;           )
CLOUD IQ, LLC; SYNERGY, LLC;            )
MOJO TRANSPORT, LLC;                    )
RONNIE GUTHRIE; JONATHON KOTTHOFF;      )
CAROL LEESE; JASON NEILITZ;             )
IVELISSE ESTRADA RIVERO; and            )
DOES 1-100;                             )
                                        )
                    Defendants.         )
_____)

YOUNG, D.J.[1]                                          June 20, 2019

**MEMORANDUM OF DECISION**

## I.    INTRODUCTION

        In this case, the Plaintiffs[2] (a putative class of workers

_____

        [1] Of the District of Massachusetts, sitting by designation.

        [2] Michael Brown, Jr.; Nathan Cole; Aaron Floyd; Brandon
Horton; Eric Moore; Gregory Seal; Manny Rivera; Dan Vischansky;
Neal Nida; Kevin Shofner; Shaun Stockton; Kyran Adams; Cody
Piper; John Gable; Donna Turbville; John Wilterding; and Richard

from across the United States) depict a scheme among multiple eager but haplessly unprepared start-up businesses and their owners to exploit the disaster of Hurricane Maria in order to promote their smartphone application, in turn exploiting the laborers they hired in the process.

The Plaintiffs allege that the Defendants recruited them to participate in a disaster relief project (the "Project") in the aftermath of Hurricane Maria. Pls.' Second Am. Collective Class Action Compl. ("Compl.") ¶¶ 55, 61, ECF No. 96. Most of the Plaintiffs travelled to Puerto Rico from the continental United States for the Project. Id. ¶¶ 10-26, 222. Many of them leased their personal equipment to the Defendants for use in the Project. Id. ¶¶ 67-74. The Plaintiffs allege that they worked on the Project for about three months in Puerto Rico but received payment for only two weeks of work. Id. ¶¶ 84-90. They further allege that many obtained neither the return of their equipment nor the lease payments they were owed under the Equipment Rental Agreement. Id. ¶ 97. They allege that many of them remain "stranded in Puerto Rico," unable to afford to travel home. Id. ¶ 96.

The Plaintiffs bring the present action seeking to recover unpaid wages, overtime compensation, damages, and attorneys'

---

Padilla; individually and on behalf of a putative class of other similarly situated workers from across the United States.

fees if they prevail on a series of claims including violations
of the wage, hour, and anti-retaliation provisions of the Fair
Labor Standards Act ("FLSA") and Puerto Rico employment laws,
breach of contract, unjust enrichment, fraudulent inducement,
conversion, and negligent bailment.  Compl. ¶¶ 151-245.  This
memorandum explains the Court's January 8, 2019 order allowing
in part and denying in part the Defendants' myriad motions to
dismiss, ECF No. 160.

## II.  FACTS ALLEGED[3]

In the aftermath of Hurricane Maria, Synergy, LLC
("Synergy"), a technology company, obtained a contract from the
Federal Emergency Management Agency ("FEMA") for a project to
assist with the enormous task of clean-up (the "Project").
Compl. ¶ 55.  In what began looking more like a Silicon Valley
collaboration than a team of emergency relief experts, Synergy
partnered with start-up technology firms ECO IQ, LLC ("ECO IQ"),
Cloud IQ, LLC ("Cloud IQ"), Migo IQ, Inc. ("Migo IQ"),
Radar_Apps, Inc. ("Radar_Apps"), and Mojo Transport, LLC
("Mojo") (collectively, including Synergy, the "Technology
Defendants") to develop and deploy a smart phone application

---

[3] As this matter is before the Court on a motion to dismiss
pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court
takes all well-pleaded facts as true.  See A.G. v. Elsevier,
Inc., 732 F.3d 77, 80 (1st Cir. 2013).

(the "App") that they planned to use to perform the multi-million-dollar contract.  Id. ¶¶ 55-57.

Cloud IQ soon sub-contracted with J&W Grading, Inc. ("J&W"), a Virginia-based contractor owned by Ronnie Guthrie ("Guthrie"), to carry out the clean-up work on the ground.  Id. ¶¶ 59-60.  J&W was not able independently to supply the staff or equipment that the Technology Defendants lacked, so J&W recruited the Plaintiffs ("men and women from around the United States") to work on the Project.  Id. ¶¶ 60-61.  J&W also arranged to rent the Plaintiffs' equipment.  Id. ¶ 67.  To this end, J&W entered into Equipment Rental Agreements with many of the individual Plaintiffs, which specified that J&W would ship the equipment to Puerto Rico and make monthly rental payments to the Plaintiffs.  Id. ¶¶ 67, 70-72.[4]

Each Equipment Rental Agreement specifies that "[t]he rent will be paid in installments of $3,000.00 each month, in advance, beginning on December 1, 2017 and will be paid on the 1st day of each succeeding month throughout the Term . . . ." Compl., Ex. B, Equipment Rental Agreement ("Equipment Rental Agreement") ¶ 4, ECF No. 96-2.  Among other things, the

---

[4] While J&W "required Plaintiffs to create business entities for the purpose of renting their equipment" to them, not all of the Plaintiffs carried out that request.  Compl. ¶ 69.  Some Equipment Rental Agreements are thus between J&W and the Plaintiffs in their individual capacities.  Id.

Equipment Rental Agreements specify that the Equipment "will remain the property of the Lessor," "[t]he Lessee will not encumber the Equipment or allow [it] to be encumbered," and "the Lessor will not disturb the Lessee's quiet and peaceful possession of the Equipment or the Lessee's unrestricted use of the Equipment for the purpose for which [it] was designed" as long as there has been no default.  Id. ¶¶ 13-16.

J&W entered into subcontractor agreements with the Plaintiffs when J&W recruited them to join the clean-up effort in Puerto Rico.  Compl. ¶¶ 61-66, Ex. A, Master Subcontractor Agreement ("Subcontractor Agreement"), ECF No. 96-1.  The Subcontractor Agreement lists J&W as the "Contractor," and refers to an unnamed "prime contractor" and "project owner." Compl. ¶ 62; Subcontractor Agreement 2-3, 11.  The Plaintiffs allege that J&W entered into this Subcontractor Agreement with them "on behalf of the Technology Firm Defendants."  Compl. ¶ 62.

The Subcontractor Agreement describes the scope of work for which the Plaintiffs were to be employed and the rates they were to be paid.  Subcontractor Agreement 12-13.  The Subcontractor Agreement promises "[g]uaranteed payment to Subcontractor for first invoices in 21 days.  Payments within 14 days thereafter. Payment via check or wired funds, whichever requested."  Id. at 2.

In January 2018, J&W officially hired the Plaintiffs in
Puerto Rico.  Compl. ¶ 76.  The Plaintiffs signed multiple
documents in a "New Hire Package," including an I-9 Employment
Eligibility Verification form, a W-4 tax form, and an "Employee
Use of Company Vehicles Agreement."  Compl. ¶¶ 77-78 & Ex. D,
J&W Grading New Hire Package ("New Hire Package") 2, ECF No. 96-
4.[5]

Reality quickly set in.  The Plaintiffs (including the
majority who had flown to Puerto Rico for no reason other than
to work on the Project) went three weeks with no work.  Compl.
¶ 83.  During this time, they did not receive per diem payments
in cash, but they did receive room and board on the island.  Id.
The Project was delayed for multiple reasons, including that the
Technology Defendants needed time to put their branding on the
equipment that they had rented from the Plaintiffs and to set up
GPS and load tracking devices on the Plaintiffs' vehicles.  Id.
¶¶ 81-82.  The Plaintiffs speculate that these delays were
because the Technology Defendants sought to employ the Project
to market and test the App they were in the process of
developing.  Id. ¶¶ 81-83.

---

[5] The parties do not dispute that -- for purposes of the
FLSA -- J&W employed the Plaintiffs for some period of time.
See generally J&W Mot.

At a meeting with all of the Plaintiffs on January 28, 2018, Jonathon Kotthoff ("Kotthoff"),[6] who the Plaintiffs allege has an ownership stake in all of the Technology Defendants, described Migo IQ as the "prime" on the Project.  Id. ¶ 137.  At this meeting, Migo IQ issued each Plaintiff an iPhone pre-loaded with the App.  Id.  The Plaintiffs were instructed to "clock in and out on the App," and were informed that the Technology Defendants would "monitor[] and control[]" all of their work remotely through the App from a room in the "main office" called the "bird house."  Id.

The Plaintiffs further allege that at that meeting, "Migo IQ and ECO IQ principals announced that they were all working under 'one flag' and 'one leadership structure' and were 'one team.'"  Id. ¶ 138.

Between February and April 2018, the Plaintiffs performed the work for which they were hired: manual clean-up such as cutting down trees and hauling debris across the island.  Id. ¶ 84.  The Plaintiffs "often" worked over eight hours per day and over forty hours per week most weeks.  Id. ¶ 85.  They

---

[6] Defendant Kotthoff's first name is spelled differently in different documents filed with the Court.  Compare Compl. 1 with Pls.' Opp'n Mot. Dismiss Migo IQ, Inc. Radar_Apps, Inc., Jonathan Kotthoff and Carol Leese 1 ("Pls.' Opp'n Mot. Migo IQ"), ECF No. 141.  The Court proceeds with the spelling on the Court's electronic court filing system ("Jonathon").

allege that they did not receive a meal period after the third and before the fifth consecutive hour of work. Id. ¶ 86.

The Plaintiffs received their first paychecks after "approximately six weeks" in Puerto Rico, which included wages for one pay period (two weeks of work). Id. ¶ 87. The Plaintiffs allege that the wages paid were "far short from the amounts owed," in part because they did not include overtime pay. Id.

After that one paycheck, the Plaintiffs maintain:

> Guthrie repeatedly promised payment of all wages due and cited many, many reasons for the failure to pay. Guthrie would announce a specific payday coming in the near future, and all Plaintiffs would anxiously await that payday. The announced payday would come and go without payment by J&W Grading or any Defendant.
> In text messages to employees, Guthrie took responsibility for some of the issues . . . Specifically, Guthrie texted: "I have some blame. I take responsibility for it and will. That why i getting [sic] a 3 million dollar loan so i can pay everyone like i said i would."

Id. ¶¶ 89-90.

At some point in the spring of 2018, J&W and Guthrie "either withdrew from the Project or were terminated." Id. ¶ 91. J&W and Guthrie "made no arrangements to pay Plaintiffs" or return their equipment prior to leaving the project. Id. ¶ 92.

The precise nature of the Plaintiffs' role on the Project after J&W and Guthrie's departure is unclear to the Court. On the one hand, the Plaintiffs allege that "[a]fter J&W Grading

was no longer on the clean-up project, principals of Synergy/ECO IQ, Migo IQ, Mojo Transport and Cloud IQ . . . supervised, directed, and controlled the work schedules and conditions of employment of all Plaintiffs." Id. ¶ 142. Incongruously, they allege that the "Technology Firm Defendants offered to 'rehire' some Plaintiffs," suggesting that the working relationship did not continue unchanged after J&W and Guthrie's departure. Id. ¶ 95.

The Plaintiffs allege that the Technology Defendants "threatened with termination and/or actually terminated and banned from working further on the clean-up project" those who sought back wages. Id. ¶ 94. Even those Plaintiffs who "were hired by the Technology Firm defendants continued to work without pay." Id. ¶ 96.

To date, the Plaintiffs have not received wages for the weeks they worked before J&W's departure and have received no payments for their leased equipment. Id. ¶ 97. They also have been unable to obtain return of their equipment in some cases because the "Defendants refused to return the property until Plaintiffs reimbursed [them] for maritime taxes." Id. ¶ 98. Some of the Plaintiffs remain "stranded in Puerto Rico," unable to afford the trip home. Id. ¶ 96. Those who have returned are losing income and work because they lack the equipment on which many of their personal businesses rely. Id. ¶ 100.

The Plaintiffs bring this action against J&W and the Technology Defendants as well as the individuals they believe own those companies. Id. ¶ 36. They allege the following regarding ownership of the Technology Defendants:

> Plaintiffs are informed and believe that Defendants Jonathon Kotthoff and Carol Leese are the owners of all Defendants except J&W Grading, Inc. Plaintiffs are informed and believe that Defendant Jason Neilitz is the owner of Defendants Cloud IQ, Inc. and Mojo Transport, LLC. Plaintiffs are informed and believe that Defendant Ivelisse Estrada Rivero is the owner of Synergy and Eco IQ.

Id.

## III. PROCEDURAL HISTORY

On May 4, 2018, the Plaintiffs sued the Defendants seeking recovery for violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201-219, and similar Puerto Rico labor statutes. Compl. 1-2. The Plaintiffs[7] also seek relief under theories of breach of contract, unjust enrichment, fraudulent inducement, and conversion. Id. ¶¶ 200-239. Finally, the Plaintiffs bring a claim of negligent bailment under section 1802 of Puerto Rico's civil code, P.R. Laws Ann. tit. 31, §§ 5141, against J&W. Id. ¶¶ 240-245.

---

[7] The Plaintiffs note at one point that only a "sub-class of plaintiffs . . . seek to recover" under "common law principles of breach of contract, unjust enrichment, and conversion," Compl. 2, but they do not specify such a sub-class in their recitation of the counts, see id. ¶¶ 200-239.

The Defendants -- J&W and Guthrie (the "J&W Defendants");
ECO IQ; Cloud IQ, Mojo, and Jason Neilitz ("Neilitz"); Migo IQ,
Radar_Apps, Kotthoff, and Carol Leese ("Leese"); Ivelisse
Estrada Rivero ("Rivero"); and Synergy -- filed six motions to
dismiss, respectively, and accompanying memoranda, to which the
Plaintiffs responded.[8]  Mot. Dismiss Third. Am. Compl. Rule
12(b)(6) Civil Procedure ("J&W Mot."), ECF No. 113; Mot. Dismiss
Third Am. Compl. Failing State Claim ("Cloud IQ Mot."), ECF No.
114; Def. Synergy LLC's Mot. Dismiss Sec. Am. Collective Action
Compl. ("Synergy Mot."), ECF No. 115; Def. Ivelisse Estrada
Rivero Mot. Dismiss Second Am. Compl. ("Rivero Mot."), ECF No.
118;[9] Def. ECO IQ LLC Mot. Dismiss Am. Compl. ("ECO IQ Mot."),
ECF No. 127; Mot. Dismiss Third Am. Compl. Rule 12(b)(6) ("Migo
IQ Mot."), ECF No. 135; Pls.' Opp'n Mot. Dismiss J&W Grading,

---

[8] ECO IQ moved to dismiss only after answering the
Plaintiffs' complaint.  Answer Second Am. Compl., ECF No. 116
(though captioned as answering the second amended complaint, ECO
IQ filed its answer after the Plaintiffs filed their third
amended complaint, ECF No. 96).  Because Federal Rule of Civil
Procedure 12(b) requires such a motion be made "before pleading
if a responsive pleading is allowed," the Court considered ECO
IQ's motion to dismiss as a motion for judgment on the pleadings
pursuant to Federal Rule of Civil Procedure 12(c), which the
Court evaluates according to the same standards as a motion
under 12(b)(6).  See Marrero-Gutierrez v. Molina, 491 F.3d 1, 5
(1st Cir. 2007).

[9] Although Synergy and Rivero describe their motions as
responding to the second amended complaint, they in fact respond
to the third amended complaint.  See Synergy Mot. 2 (indicating
that the motion responds to the complaint filed at "Doc. 96");
Rivero Mot. 2 (same).

Inc. & Ronnie Guthrie ("Pls.' Opp'n Mot. J&W"), ECF No. 121;

Pls.' Opp'n Mot. Dismiss Cloud IQ, Mojo Transport & Jason

Neilitz ("Pls.' Opp'n Mot. Cloud IQ"), ECF No. 123; Pls.' Opp'n

Mot. Dismiss Synergy, LLC ("Pls.' Opp'n Mot. Synergy"), ECF No.

122; Pls.' Opp'n Mot. Dismiss Def. Ivelisse Estrada Rivero

("Pls.' Opp'n Mot. Rivero"), ECF No. 124; Pls.' Opp'n Mot.

Dismiss ECO IQ ("Pls.' Opp'n Mot. ECO IQ"), ECF No. 136; Pls.'

Opp'n Mot. Migo IQ.

J&W sought bankruptcy protection on December 11, 2018,

while the Defendants' 12(b)(6) motions were pending.  Mot.

Withdraw Counsel Defs. J&W Grading, Inc. and Ronnie Guthrie

("Mot. Withdraw"), Attachment 2, Voluntary Pet. Non-Individuals

Filing Bankruptcy ("J&W Grading Bankruptcy Pet."), ECF No. 149-

2; Electronic Clerk's Notes, ECF No. 159.  As a result, all

claims as to J&W were automatically stayed.  Id.; see 11 U.S.C.

§ 362(a)(1).

The Court held a hearing on the motions to dismiss on

December 20, 2018, at which counsel for all of the Defendants

except J&W (any proceedings against it having been stayed) and

Guthrie were present.  Electronic Clerk's Notes, ECF No. 159.

On January 8, 2019, the Court allowed in part and denied in part

the pending motions to dismiss.  Order, ECF No. 160.  This

memorandum explains that order.[10,11]  It also responds to the

Plaintiffs' motions for reconsideration, ECF Nos. 164, 195, and

provides the reasoning underlying its orders rejecting those

respective reconsideration motions, ECF Nos. 172, 197.

## IV.  STANDARD OF REVIEW

When reviewing a motion to dismiss, the Court accepts all

of the complaint's well-pled factual allegations as true and

draws all reasonable inferences in the plaintiff's favor.  See

Langadinos v. American Airlines, Inc., 199 F.3d 68, 69 (1st Cir.

2000).  Excepting those allegations "that simply offer legal

labels and conclusions or merely rehash cause-of-action

elements," Schatz v. Republican State Leadership Comm., 669 F.3d

50, 55 (1st Cir. 2012), a complaint must include "enough facts

to state a claim to relief that is plausible on its face" to

---

[10] On January 23, 2019, the Court received notice that
Guthrie also had filed for bankruptcy.  Notice Bankruptcy Filing
¶¶ 1-2, ECF No. 165.  As a result, this action is now stayed
with respect to Guthrie.  See 11 U.S.C. § 362(a)(1).

[11] The stay of proceedings against J&W Grading and Guthrie
does not extend to any of the other Defendants.  See 3 Collier
on Bankruptcy ¶ 362.03 (Richard Levin & Henry J. Sommer, eds.
16th ed. 2018) ("Although the stay [under section 362] protects
the debtor against a broad range of actions and activities, it
does not protect separate legal entities, such as corporate
directors, officers or affiliates, partners in debtor
partnerships or codefendants in pending litigation.") (citing,
among other cases, Patton v. Bearden, 8 F.3d 343, 348-49 (6th
Cir. 1993); Credit All. Corp. v. Williams, 851 F.2d 119, 121
(4th Cir. 1988); Wedgeworth v. Fibreboard Corp., 706 F.2d 541,
544 (5th Cir. 1983)).

survive a motion to dismiss, Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).

## V.    FAIR LABOR STANDARDS ACT AND ASSOCIATED CLAIMS

The Plaintiffs bring three claims under the Fair Labor Standards Act ("FLSA").  Compl. ¶¶ 151-72; 29 U.S.C. §§ 201-219. They allege in counts I and II that the Defendants violated the FLSA's wage and overtime protections, Compl. ¶¶ 151-64, and in count III that the Technology Defendants violated the FLSA's prohibition on retaliation against those exercising their rights under the statute, id. ¶¶ 165-72.

The Defendants are only liable for such violations if they are "employers" of the Plaintiffs under the FLSA.  See Donovan v. Agnew, 712 F.2d 1509, 1510 (1st Cir. 1983).  Synergy, Rivero, ECO IQ, Neilitz, Migo IQ, Kotthoff, and Leese ask this Court to dismiss the FLSA claims against them on the grounds that they were not "employers" of the Plaintiffs.  See Synergy Mot. 5-20; Rivero Mot. 6-14; ECO IQ Mot. 7-18; Cloud IQ Mot. 21-26; Migo IQ Mot. 2, 6-11.  Cloud IQ, Mojo, and Radar_Apps do not contest their FLSA employer liability.

The absence of available documentation describing the relationship between the Plaintiffs and the Technology Defendants and their owners does not overcome the compelling circumstantial evidence that the Plaintiffs have alleged suggesting the existence of an employer-employee relationship.

Because the Plaintiffs adequately allege that Synergy, Rivero, ECO IQ, Neilitz, Migo IQ, Kotthoff, and Leese employed them pursuant to the FLSA, this Court denied all motions to dismiss on this ground.

Moreover, the FLSA only applies to employment relationships with a "sufficient nexus to interstate commerce." Martinez v. Petrenko, 792 F.3d 173, 175 (1st Cir. 2015); see also 29 U.S.C. § 207(a)(1). A plaintiff can establish this nexus either by showing that they, as an employee, engaged in interstate commerce ("individual coverage") or that their employer has other employees engaging in interstate commerce and has annual gross sales of at least $500,000 ("enterprise coverage"). Martinez, 792 F.3d at 174-75.

Cloud IQ, Mojo, Neilitz, Migo IQ, Radar_Apps, Kotthoff, and Leese argue that the Plaintiffs fail plausibly to plead either individual or enterprise coverage. Cloud IQ Mot. 8-18; Migo IQ Mot. 8. The Court rules that the Plaintiffs allege individual coverage and thus does not opine on enterprise coverage.

Because the Plaintiffs fail to meet the pleading standards described in Pruell v. Caritas Christi, 678 F.3d 10, 13-15 (1st Cir. 2012), however, the Court granted Cloud IQ, Mojo, Neilitz, Synergy, and Rivero's motions to dismiss the Plaintiffs' overtime claims arising under the FLSA and its Puerto Rico law counterpart.

**A.    Employer Liability Under the FLSA**

Under the FLSA, an employer is "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). The statute further defines the term "employ" to "include[] to suffer or permit to work." Id. § 203(g). The Supreme Court has made clear that courts are to interpret this definition expansively, and an employee may have "several simultaneous employers." Donovan, 712 F.2d at 1510-11 (citing Falk v. Brennan, 414 U.S. 190, 195 (1973)). "Joint employers," as such simultaneous employers are called, are "individually and jointly" responsible for "compliance with all of the applicable provisions of the act." 29 C.F.R. § 791.2(a).

Under the FLSA's interpreting regulations, a joint employment relationship exists:

> in situations such as: (1) Where there is an arrangement between the employers to share the employee's services, as, for example, to interchange employees; or (2) Where one employer is acting directly or indirectly in the interest of the other employer (or employers) in relation to the employee; or (3) Where the employers are not completely disassociated with respect to the employment of a particular employee and may be deemed to share control of the employee, directly or indirectly, by reason of the fact that one employer controls, is controlled by, or is under common control with the other employer.

29 C.F.R. § 791.2(b).[12]

---

[12] While this Court wrote this memorandum, the Department of Labor issued a Notice of Proposed Rulemaking to revise the standards for evaluating a joint employment relationship in

To evaluate joint employer status under the FLSA, the First Circuit employs a four-factor test that attempts to capture the "economic reality," or the degree of an employee's dependence on the alleged employer.  See Baystate Alt. Staffing, Inc. v. Herman, 163 F.3d 668, 675 (1st Cir. 1998).  This test directs courts to consider "whether the alleged employer (1) had the power to hire and fire the employees;[13] (2) supervised and controlled employee work schedules or conditions of employment; (3) determined the rate and method of payment; and (4) maintained employment records."  Id. (citing Bonnette v. California Health & Welfare Agency, 704 F.2d 1465, 1470 (9th Cir. 1983)); see also Manning v. Boston Med. Ctr. Corp., 725

_____

section 791 of chapter 29 of the Code of Federal Regulations. Joint Employer Status under the Fair Labor Standards Act ("Joint Employer Status NPRM"), 84 Fed. Reg. 14,043 (Mar. 29, 2019) (to be codified at 29 C.F.R. § 791).  Among other things, the proposed rule would eliminate the "not completely disassociated" factor and make it easier for corporations to escape liability for the minimum-wage violations of their franchisees or contractors.  See id. at 14,044; see also Noam Scheiber, U.S. Moves to Shield Chains from Claims, N.Y. Times, Apr. 2, 2019, at B3 (reporting that the Joint Employer Status NPRM would narrow when an "upstream" company may be liable under the FLSA when it assists another company that directly supervises or hires and fires employees).

[13] In its proposed rule adopting the Baystate/Bonnette factors as the definitive test of joint employment status, the Department of Labor suggests modifying the first factor from the "ability, power, or reserved contractual right" to hire and fire and employee to the "actual exercise of power" to hire and fire. 84 Fed. Reg. at 14,044.

F.3d 34, 47 (1st Cir. 2013).  Neither the presence of evidence

satisfying a single factor nor the absence of evidence

satisfying another is dispositive.  Baystate, 163 F.3d at 676

("[I]t is the totality of the circumstances, and not any one

factor, which determines whether a worker is the employee of a

particular alleged employer.").

The Plaintiffs allege facts suggesting the Technology

Defendants[14] were joint employers under the Baystate factors.

This Court all but ignores such conclusory statements as the

Plaintiffs' allegation that Synergy, ECO IQ, Cloud IQ, Migo IQ,

Mojo, and J&W "made statements that they had the power to hire

and fire Plaintiffs."  Compl. ¶ 140; see Schatz, 669 F.3d at 55.

The Court pays more heed, however, to the following specific

allegation: "In the January 28, 2018 meeting, Migo IQ and ECO IQ

identified various conduct that would get Plaintiffs 'sent

home,' including not doing as instructed, self-monitoring and

not using the App."  Compl. ¶ 141.  This allegation supports the

---

[14] In this section, the Court refers at times to the
Technology Defendants without distinction because some of them
seek to escape FLSA liability by asserting that J&W and Guthrie
alone employed the Plaintiffs.  See Synergy Mot. 5-20; Rivero
Mot. 9-10; ECO IQ Mot. 8, 16-17; Cloud IQ Mot. 21-26; Migo IQ
Mot. 6, 10.  Although the Court refers to the Technology
Defendants collectively to distinguish them from J&W and
Guthrie, the Court does not entertain a challenge to the FLSA
liability of Cloud IQ, Mojo, and Radar_Apps because they do not
raise one.

claim that at least Migo IQ and ECO IQ had the power to hire and fire the Plaintiffs, satisfying the first Baystate factor.

As for the second Baystate factor, the Plaintiffs have detailed a chain of command in which all of the Technology Defendants cooperated in supervising and controlling the Plaintiffs' work. The Plaintiffs describe that "Synergy received the money and Migo IQ received the job orders from the municipalities. Migo IQ gave those orders to Cloud IQ[, which] acted as the foreman, telling Plaintiffs where to go and what to do each day." Compl. ¶ 136. They further allege that:

> Migo IQ issued each Plaintiff an I-phone 8 with [the] App pre-loaded. Plaintiffs were required to clock in and out on the App and . . . . Migo IQ, Cloud IQ and Synergy all watched the App in action and monitored Plaintiffs work remotely from a room back at the main office, called the "bird house."

Id. ¶ 137.

These allegations (the Plaintiffs make no substantive and specific allegations under Baystate factors three and four) may be sufficient on a motion to dismiss to show that at least Synergy, ECO IQ, Migo IQ, and J&W jointly employed the Plaintiffs. See Blanco v. United Comb & Novelty Corp., Civ. A. No. 13-10829, 2013 U.S. Dist. LEXIS 151475, at *11 (D. Mass. Oct. 22, 2013) (Hillman, J.) (ruling that complaint sufficiently alleged joint employer status under Baystate when it claimed alleged employer "hired, disciplined or terminated the

Plaintiffs; set all job classifications for working in the factory; set rates of pay . . . ; set shifts; supervised and reviewed the Plaintiffs' work at the factory; and assigned jobs" but claimed nothing about maintenance of employment records); cf. Franco v. Roman's Commercial Cleaning & Prop. Maint., Inc., Civ. A. No. 16-225 WES, 2018 U.S. Dist. LEXIS 90532, at *6-10 (D.R.I. May 31, 2018) (holding that complaint insufficiently alleged joint employer status when it did not allege that putative employer had any power over employees' hiring or termination nor that it ever dictated employees' schedule or method of completing tasks).

To supplement its analysis, the Court considers other factors that aid in evaluating joint employment in the context of a sub-contracting relationship. See, e.g., Jacobson v. Comcast Corp., 740 F. Supp. 2d 683, 689 (D. Md. 2010) (citing Zheng v. Liberty Apparel Co., 355 F.3d 61, 72 (2d Cir. 2003)) (looking to "various miscellaneous factors" when the standard four factors (the same as in Baystate) are "inconclusive" in the context of a multi-layer contracting relationship).

In Zheng, the Second Circuit vacated the district court's decision –– which was based on a four-factor test almost identical to that in Baystate –– that a garment manufacturer was not liable under the FLSA for employment violations with respect to garment workers who worked predominantly on the

manufacturer's products.  See Zheng, 355 F.3d at 63-64.  Noting

that "[t]he 'economic reality' test . . . is manifestly not

intended to bring normal, strategically-oriented contracting

schemes within the ambit of the FLSA," the Second Circuit

recognized that slavish focus on those four factors is not

appropriate when doing so excludes from the FLSA's ambit

"outsourcing relationships that lack a substantial economic

purpose."  See id. at 76.

Noting similarities between the case before it and the

facts of Rutherford Food Corp. v. McComb, 331 U.S. 722, 730

(1947) -- where the Supreme Court held that a slaughterhouse

employed meat boners although a contractor hired, paid, and

directly supervised them -- the Second Circuit in Zheng drew on

the factors that the Supreme Court considered in Rutherford.

Zheng, 355 F.3d at 72.  The Second Circuit considered:

> (1) whether [the manufacturer's] premises and equipment
> were used for the plaintiffs' work; (2) whether the
> [c]ontractor . . . had a business that could or did shift
> as a unit from one putative joint employer to another;
> (3) the extent to which the plaintiffs performed a
> discrete line-job that was integral to [the
> manufacturer's] process of production; (4) whether
> responsibility under the contracts could pass from one
> subcontractor to another without material changes; (5)
> the degree to which the [manufacturer] or their agents
> supervised plaintiffs' work; and (6) whether plaintiffs
> worked exclusively or predominantly for the
> [manufacturer].

Id.

Considering the Baystate factors along with those the
Second Circuit emphasized in Zheng, see Franco, 2018 U.S. Dist.
LEXIS 90532, at *8-13 (supplementing Baystate factors with those
in Zheng), it becomes clear that the Plaintiffs sufficiently
have alleged that Synergy, ECO IQ, and Migo IQ are joint
employers under the FLSA.

The ownership of the Project's equipment is relevant
because it "may support the inference that a putative joint
employer has functional control over the plaintiffs' work." See
Zheng, 355 F.3d at 72. While the Plaintiffs employed their own
and J&W's equipment for the work, Synergy, ECO IQ, and Migo IQ
insisted that the equipment display their logos. Compl. ¶ 81.
Further, Rivero, the president of Synergy, stated "we bring the
equipment . . . and we bill directly here . . . the equipment is
in Puerto Rico, we bring them under contractual business
conditions, under Synergy." Id. ¶ 124 (second omission in
original). Even "[a]fter J&W Grading was no longer on the
clean-up project, principals of Synergy/ECO IQ, Migo IQ, Mojo
Transport and Cloud IQ continued to use Plaintiffs' vehicles and
equipment." Id. ¶ 143.

J&W recruited the Plaintiffs for work specifically on this
Project, id. ¶¶ 59-61, so the Plaintiffs -- as a collective
entity -- had only one project. This matters "because a
subcontractor that seeks business from a variety of contactors

is less likely to be part of a subterfuge arrangement than a subcontractor that serves a single client." See Zheng, 355 F.3d at 72. This dovetails with the sixth factor in Zheng, exclusive or predominant work for the alleged joint employer, as nothing suggests that the Plaintiffs worked on any project other than the Defendants' Project while in Puerto Rico. Id. at 75.

As FEMA provided the Technology Defendants a contract to assist with hurricane clean-up, Compl. ¶¶ 54-55, 123 ("Synergy was hired to collect 200,000 cubic yards of vegetative material and debris in Ponce"), and J&W and the Plaintiffs were the only entities on the Project with the experience and equipment to perform clean-up work, id. ¶¶ 59-60, the Plaintiffs' work was an integral part of the Technology Defendants' overall business objective. See Zheng, 355 F.3d at 72.

The complaint's opacity regarding the relationship between the Plaintiffs and the Technology Defendants after J&W Grading's departure obscures whether responsibility under the contract could pass "without material changes" from one sub-contractor to another. See id. at 74. Evidence that some of the Plaintiffs continued working for the Technology Defendants after J&W's departure, such as the allegation that "principals of Synergy/ECO IQ, Migo IQ, Mojo Transport and Cloud IQ . . . supervised, directed and controlled the work schedules and conditions of employment of all Plaintiffs," Compl. ¶ 142,

suggests that work could pass easily from one sub-contractor to another. If so, this implies that -- as in Rutherford -- the "employees [were] tied to [the alleged joint employers] rather than to an ostensible direct employer [such as J&W]." See Zheng, 355 F.3d at 74 (citing Rutherford, 331 U.S. at 725, 730).

An entity's supervision of workers indicates joint employer status "only if it demonstrates effective control over the terms and conditions of the plaintiff's employment." Zheng, 355 F.3d at 75 (citing Rutherford, 331 U.S. at 726). The Plaintiffs allege that the Technology Defendants exerted significant control over them through, for example, the routes that they assigned, see Compl. ¶ 126, and the fact that the "Plaintiffs were required to use the App and submit certain forms to J&W Grading and the Technology Firm Defendants in order to get paid," id. ¶ 133 (emphasis added). These allegations may not amount to "effective control," but they certainly show control that exceeds "supervision with respect to contractual warranties of quality and time of delivery" that is typical of a "legitimate subcontracting arrangement." Zheng, 355 F.3d at 75 (citing Moreau v. Air France, 343 F.3d 1179, 1188 (9th Cir. 2003)).

The Plaintiffs also plausibly have alleged that Rivero, Kotthoff, and Leese were joint employers pursuant to the FLSA. "[A] corporate officer with operational control of a

corporation's covered enterprise is an employer along with the corporation, jointly and severally liable under the FLSA for unpaid wages." Chao v. Hotel Oasis, Inc., 493 F.3d 26, 34 (1st Cir. 2007) (quoting Donovan, 712 F.2d at 1511). The Plaintiffs' allegations that Kotthoff and Leese own and manage Synergy, ECO IQ, Cloud IQ, and Migo IQ (supported by specific allegations that Kotthoff spoke with authority at meetings and reiterated that the companies "were all working under 'one flag,'" Compl. ¶ 138), and that Rivero owns Synergy and ECO IQ, id. ¶¶ 36-37, 123-27, plausibly allege that they are also joint employers pursuant to the FLSA.

In sum, given the sufficiency of the allegations suggesting the FLSA employer liability of Synergy, Rivero, ECO IQ, Neilitz, Migo IQ, Kotthoff, and Leese, the Court denied the motions to dismiss on that ground.

**B. Individual Coverage Under the FLSA**

Some of the Defendants argue that the Plaintiffs fail to establish a sufficient nexus to interstate commerce for the FLSA to apply. See Cloud IQ Mot. 8-18; Migo IQ Mot. 8.

The FLSA's minimum wage and overtime protections cover "employees engaged in commerce" ("individual coverage") or "employed in an enterprise engaged in commerce or the production of goods for commerce" ("enterprise coverage"). 29 U.S.C. § 206(a); see also Tony & Susan Alamo Found. v. Secretary of

Labor, 471 U.S. 290, 295 n.8 (1985) (delineating types of FLSA coverage and noting that "enterprise coverage" -- introduced in 1961 -- "substantially broadened the scope of the Act"). The statute defines "commerce" to include "trade, commerce, transportation, transmission, or communication among the several States or between any State and any place outside thereof," 29 U.S.C. § 203(b), and an "enterprise engaged in commerce or the production of goods for commerce" as one that:

(i)     has employees engaged in commerce or in the
        production of goods for commerce, or that has
        employees handling, selling, or otherwise
        working on goods or materials that have been
        moved in or produced for commerce by any
        person; and
(ii)    is an enterprise whose annual gross volume of
        sales made or business done is not less than
        $500,000 . . . .

29 U.S.C. § 203(s)(1)(A)(i)-(ii).

The Plaintiffs urge the Court to rule that they are subject to FLSA individual coverage because (1) they crossed state lines to commence their work on the Project, Compl. ¶ 147; (2) residents of other jurisdictions performing disaster relief in Puerto Rico inherently are involved in interstate commerce, id. ¶¶ 147-48; (3) their activities were necessary to reopen instrumentalities to make interstate commerce "free and unbounded," id. ¶ 149; and (4) their activities facilitated interstate travel by individuals and businesses, id. ¶ 150.

Although the First Circuit offers no "road map" as to how employees can show individual coverage, Martinez, 792 F.3d at 175, Department of Labor regulations interpreting the reach of the FLSA's wage and hour provisions are instructive, see 29 C.F.R. § 776.9. In defining the general scope of "in commerce" coverage, these regulations offer the following considerations:

> One practical question to be asked is whether, without the particular service, interstate or foreign commerce would be impeded, impaired, or abated; others are whether the service . . . makes it possible for existing instrumentalities of commerce to accomplish the movement of such commerce effectively and to free it from burdens or obstructions.

Id.

Cloud IQ, Mojo, and Neilitz point to a Fourth Circuit case for the proposition that transporting refuse is an inherently local activity that cannot be the basis for individual coverage. Cloud IQ Mot. 14-16 (citing Wirtz v. Modern Trashmoval, Inc., 323 F.2d 451 (4th Cir. 1963)). Many of the elements absent in Modern Trashmoval on which the Fourth Circuit relied to rule that there was no FLSA individual coverage there are, however, present here. See Modern Trashmoval, 323 F.2d at 453, 457 (noting that the "employees [did not] either cross[] state lines in connection with [their] employment, handle[] goods directly moving in the channels of interstate commerce, or directly contribute[] to the repair or extension of facilities of interstate commerce").

The Defendants also fail to mention that three years prior to the Fourth Circuit's opinion in Modern Trashmoval, the First Circuit reached a contrary conclusion on similar facts in Mitchell v. Dooley Bros., Inc., 286 F.2d 40 (1st Cir. 1960). In Mitchell, the First Circuit held that independent contractors engaged in local debris collection from homes, businesses, and government agencies were "engaged in commerce," emphasizing that "the removal of the debris seems as closely related [to the production of goods for commerce] as it does essential." 286 F.2d at 44.

The Plaintiffs point to Maxwell v. G.R.A.C.E. Community Services, where a district court in Texas denied a motion to dismiss overtime claims arising out of disaster relief work after Hurricane Katrina based on the substantial effect of disaster relief on freeing the instrumentalities of, and thereby enabling, interstate commerce. Civ. A. No. H-09-3989, 2011 U.S. Dist. LEXIS 69340, *10 (S.D. Tex. June 28, 2011) ("By helping disaster victims locate resources to get back on their feet, Defendants are undoubtedly helping people return to work, restore their businesses, and even to resume interstate travel.").

While clearing the roads in one of the continental United States more directly facilitates interstate travel than the same work on an insular American territory, the Plaintiffs' relief

work nonetheless facilitated interstate travel; one can only get to the airport or a port for interstate or foreign travel if the roads are clear of debris.  See Compania de Ingenieros y Contratistas, Inc. v. Goldberg, 289 F.2d 78, 80 (1st Cir. 1961) (holding that FLSA covers employees working on construction of public highways in Puerto Rico); see also 29 U.S.C. § 203(c) (defining "state" in the FLSA as "any State of the Untied States or the District of Columbia or any Territory or possession of the United States").  But cf. United States v. Maldonado-Burgos, 844 F.3d 339, 350-51 (1st Cir. 2016) (holding that Puerto Rico is not a "territory or possession" for purposes of section 2421(a) of title 18 of the United States Code).[15]

The Court is persuaded that the Plaintiffs adequately have alleged[16] that they engaged in interstate commerce as it is defined in the FLSA by stating that they traveled to Puerto Rico, transported tools and equipment from the continental United States to Puerto Rico, employed those imported tools to clean up debris across the island, and conducted disaster relief efforts in Puerto Rico pursuant to a FEMA contract.  See

---

[15] No party here disputes that Puerto Rico is a state for the purposes of the FLSA's jurisdictional reach.

[16] FLSA coverage is an element of an FLSA claim, not a question of subject matter jurisdiction.  See Chao, 493 F.3d at 33.

_generally_ Compl.  The Court notes that while not all of the

Plaintiffs traveled to Puerto Rico for the Project, _see, e.g._,

_id._ ¶¶ 12, 17, the Plaintiffs allege that they all employed

tools that had been transported from the continental United

States, and some assisted in unloading that equipment from

barges upon its arrival in Puerto Rico, _see_ _id._ ¶¶ 67, 83, 124,

127, 145-46.

As the Plaintiffs plausibly allege that the Defendants were

their employers, as discussed above, and the Plaintiffs

plausibly allege individual coverage under the FLSA, each of the

Defendants is subject to the FLSA's reach.

**C.   Alleged Minimum Wage and Retaliation Violations**

Because the Plaintiffs plausibly allege violations of the

FLSA's wage and retaliation provisions, the Court denied the

Technology Defendants' motions to dismiss counts I and III for

failure to state a claim.  For the same reason, the Court denied

the motions to dismiss counts V and VII, Plaintiffs' claims

based on corollary provisions in Puerto Rican law.[17]   _See_ P.R.

---

[17] The Defendants do not mount any challenges to the Puerto
Rico labor law claims in particular; they rely on their
challenges to the Plaintiffs' FLSA claims.  _See_ Cloud IQ Mot. 4-
8; Rivero Mot. 12-13; ECO IQ Mot. 17-18; _see generally_ Synergy
Mot. (arguing only that FLSA does not apply because Synergy is
not a joint employer); Migo IQ Mot. (arguing that only J&W
should be liable to the Plaintiffs for any of their claims).
Thus the Court does not consider whether the Plaintiffs state a
claim under Puerto Rico labor law.  _See_ Roberts v. USO Council
of P.R., 98 TSPR 25 (1998) ("The [FLSA] does _not_ incorporate

Laws Ann. tit. 29, § 250 (applying the FLSA's federal minimum
wage and implementing "provisions in federal legislation and
regulations" to workers in Puerto Rico); id. § 194a (protecting
workers from retaliation by employer in Puerto Rico).

In contesting the sufficiency of the Plaintiffs' wage
violation allegations, Cloud IQ, Mojo, Neilitz, and Guthrie
point to the absence of specific allegations regarding the daily
flat pay rates owed to the Plaintiffs, the specific two weeks
for which they were paid, the amount they were paid in the one
paycheck they received, an estimated number of unpaid hours, and
the overall amount the Plaintiffs were owed.  Cloud IQ Mot. 4-5;
J&W Mot. 6-7.  They liken such gaps to those in Pruell, where
the First Circuit affirmed dismissal of an FLSA action where the
plaintiffs failed to allege specific estimates for the amount
unpaid and hours worked.  Cloud IQ Mot. 4-6; J&W Mot. 6-7;
Pruell, 678 F.3d at 12-14.

While the Plaintiffs allege in a fairly conclusory manner
that they "regularly worked over 8 hours per day and over 40
hours per week," Compl. ¶¶ 153, 160, 177, 184, they provide more
detail than the Pruell plaintiffs did and enough to overcome the
Defendants' motions.  True, the First Circuit in Pruell said
that an allegation that plaintiffs "regularly worked hours over

state labor legislation.  The latter may only be applied insofar
as it would be more beneficial to the worker . . . .").

40 in a week and were not compensated" was "one of those
borderline phrases," that, "[s]tanding alone," was "little more
than a paraphrase of the statute." 678 F.3d at 13. The
Plaintiffs' allegation here, however, does not stand alone. The
Plaintiffs allege the approximate date of the sole paycheck that
they received. Compl. ¶ 87. They point to the rate schedule
listed in the Subcontractor Agreement as defining the minimum
wages to which they were entitled. Id. ¶ 154. They provide
further support for their underpayment allegations by alleging
that Guthrie, the president of J&W, sent text messages to the
employees stating: "I take responsibility for [the delayed
payments] and will. That why [sic] i getting a 3 million dollar
loan so I can pay everyone like i said i would." Id. ¶ 90.

There is less great a need for specific numbers to
calculate the degree to which they were underpaid than in some
other cases because, as the Plaintiffs point out, "no
complicated mathematical calculation is needed to determine that
Plaintiffs were not paid minimum wage" if they received no
payment at all for ten of twelve weeks. Id. ¶ 153. Moreover,
some of the considerations counseling leniency in Pruell are
also present here. For example, "some of the information needed
may be in the control of defendants." Pruell, 678 F.3d at 15.

Because these allegations suffice to state a plausible
claim to relief for violation of the minimum wage provisions of

the FLSA, and thus also the minimum wage provisions of the
Puerto Rican code, the Court denied the motions to dismiss on
this ground.

Likewise, the Court denied the motion to dismiss for
failure to state a retaliation claim under the FLSA and Puerto
Rico law.

To state a retaliation claim under FLSA section 15(a)(3),
the Plaintiffs must allege that (1) they "engaged in a
statutorily protected activity," and (2) the employer "subjected
[them] to an adverse employment action (3) as a reprisal for
having engaged in protected activity." Claudio-Gotay v. Becton
Dickinson Caribe, Ltd., 375 F.3d 99, 102 (1st Cir. 2004) (citing
Blackie v. Maine, 75 F.3d 716, 722 (1st Cir. 1996)).  An
employee engages in statutorily protected activity when he or
she "'step[s] outside' a normal role . . . based on a reasonable
belief that the employer engaged in conduct" that violates the
FLSA.  Claudio-Gotay, 375 F.3d at 102 (quoting EEOC v. HBE
Corp., 135 F.3d 543, 554 (8th Cir. 1998)).  "[T]he assertion of
statutory rights is the hallmark of protected activity."  Id.
(quoting McKenzie v. Renberg's Inc., 94 F.3d 1478, 1486 (10th
Cir. 1996)).

The Plaintiffs allege that the Defendants terminated them
or threatened to terminate them when they sought back pay and
the Defendants became aware that the Plaintiffs planned to bring

a lawsuit alleging violations of the FLSA.  Compl. ¶¶ 94, 167–72.  These allegations squarely suffice to state a plausible claim of retaliation.

### D.   Failure to Plead Overtime Violations

Some of the Defendants argue that the Plaintiffs fail sufficiently to plead overtime violations under the FLSA and Puerto Rican law.  Cloud IQ Mot. 4–7; Synergy Mot. 11–12; Rivero Mot. 12–13; see 29 U.S.C. § 207(a)(1) (requiring extra wages for work hours above forty-hour workweek); P.R. Laws Ann. tit. 29, § 271–274 (same).  The Court agrees that the Plaintiffs' allegations do not meet the Pruell standards for pleading overtime violations, and dismissed count II as to Cloud IQ, Mojo, Neilitz, Synergy, and Rivero and count VII as to Cloud IQ, Mojo, and Synergy on their motions.

To defend the sufficiency of their overtime allegations, the Plaintiffs attempt to rely again on the fact that "no complicated mathematical calculation" of hours worked overtime is needed if their payments were simply never submitted.  Compl. ¶ 153.  This is true, but the Plaintiffs must allege specific instances in which they actually worked overtime or provide other "substantive content to elevate the FLSA claims above the mere possibility of defendants' liability."  Manning, 725 F.3d at 45; see also Pruell, 678 F.3d at 14 (reasoning that allegation of work in excess of forty hours per week

[34]

insufficient because "various forms of 'work' may not be not compensable" under the FLSA); Ramos v. Jose Santiago, Inc., Civ. A. No. 16-3162, 2017 U.S. Dist. LEXIS 89241, at *3-4 (D.P.R. June 8, 2017) (Delgado-Hernández, J.) (disregarding allegations such as that plaintiffs "regularly and consistently worked more than 40 hours per workweek" because they "solely state the obvious").

The Plaintiffs' allegations ("Plaintiffs often worked several consecutive days that exceeded 8 hours," Compl. ¶ 85, "Plaintiffs were required to work off the clock," id., and "were not paid for missed meal periods at double the rate," id. ¶ 86) closely resemble the claims the First Circuit dismissed in Pruell as merely conclusory, see Pruell, 678 F.3d at 13-14 (ruling allegation that the plaintiffs "regularly worked hours over 40 in a week and were not compensated for such time" as "little more than a paraphrase of the statute."). Further, they lack the type of substantive context that rendered overtime allegations in Manning plausible. 725 F.3d at 45-46 (citing specific factual allegations showing that nurses worked, uncompensated, during lunch breaks and before and after shifts on top of forty-hour workweeks). With the Plaintiffs' limited concrete factual allegations regarding overtime work here, the Court granted the Defendants' motions to dismiss counts II and VI for failure to state a claim.

## VI. NO PRIVATE RIGHT OF ACTION UNDER PUERTO RICO'S TIME AND MANNER OF PAYMENT LAW

In count IV, the Plaintiffs allege that the J&W Defendants and the Technology Defendants are liable for violations of Puerto Rico's wage and manner of payment requirements pursuant to section 173 of title 29 of the Annotated Laws of Puerto Rico ("section 173"). Compl. ¶¶ 173-81. This section of the Puerto Rican code sets out specific requirements as to the time and manner of payments to employees. See P.R. Laws Ann. tit. 29, §§ 171-179. As relevant here, the code requires that the "total amount of wages due to a worker or employee shall be paid in legal tender . . . at intervals which shall not exceed fifteen (15) days." Id. § 173.

In its motion for judgment on the pleadings, ECO IQ argued that liability under this section is improper because section 173 of title 29 of the Annotated Laws of Puerto Rico does not create a private cause of action. ECO IQ Mot. 19. The Plaintiffs did not respond to this argument in their opposition to ECO IQ's motion. See generally Pls.' Opp'n Mot. ECO IQ; but see Pls.' Mot. Recons. & Clarification Ct.'s Order Granting Part & Denying Part Defs.' Mots. Dismiss ("Pls.' Mot. Recons.") 15-17, ECF No. 164 (arguing that there is indeed a private right of action under section 173). The Court agrees with ECO IQ's

assessment and accordingly dismissed all counts arising under this provision of Puerto Rican law.

The Court looks to federal law for guidance on this question of statutory interpretation.  See Rodriguez v. Bennett, 540 F. Supp. 648, 651 (D.P.R. 1982) (Cerezo, J.) (looking to Supreme Court precedent that analyzes when to infer private cause of action in federal statute when determining whether to infer private cause of action without the intervention of the Secretary of Labor for violation of Puerto Rico labor law).

When a statute does not include an express private cause of action, "[t]he judicial task is to interpret the statute . . . to determine whether it displays an intent to create not just a private right but also a private remedy."  Alexander v. Sandoval, 532 U.S. 275, 286 (2001) (citing Transamerica Mortg. Advisors, Inc. v. Lewis, 444 U.S. 11, 15 (1979)).  "If the statute itself does not 'displa[y] an intent' to create 'a private remedy,' then 'a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute.'"  Ziglar v. Abbasi, 137 S. Ct. 1843, 1856 (2017) (alteration in original) (quoting Alexander, 532 U.S. at 286-87).  Moreover, "certain factors cut against finding an implied private cause of action in a given statute, such as the existence of other express enforcement provisions."  Allco Renewable Energy Ltd. v.

<u>Massachusetts Elec. Co.</u>, 875 F.3d 64, 70 (1st Cir. 2017).

"Sometimes the suggestion is so strong that it precludes a finding of congressional intent to create a private right of action, even though other aspects of the statute . . . suggest the contrary." <u>Alexander</u>, 532 U.S. at 290.

Section 173 and related provisions do not expressly contemplate a private right of action.[18] <u>See generally</u> P.R. Laws Ann. tit. 29, §§ 171-179. The Plaintiffs admit that there are no available cases in which the courts of Puerto Rico have adjudicated private suits brought pursuant to section 173. <u>See</u> Pls.' Mot. Recons. 16. The Court looks to other statutory provisions to assess whether there is an implied private cause of action in section 173, but -- as a federal court applying Puerto Rico law -- is reticent to expand the Commonwealth of Puerto Rico's law without a clear indication that the

---

[18] In their complaint, the Plaintiffs assert that section 177 of title 29 of the Annotated Laws of Puerto Rico ("section 177") authorizes employees to obtain unpaid wages, liquidated damages, costs, and attorney fees from an employer that has violated the act's provisions, and suggest that section 177 authorizes an employee to seek such damages in a civil action like their own. Compl. ¶ 175. Section 177 does no such thing; rather, it establishes a criminal penalty for violations of sections 171 to 177. P.R. Laws Ann. tit. 29, § 177. Section 177 does contemplate that an employee can recover unpaid wages and liquidated damages if the employer voluntarily makes such payment within ten days of the salary payment date to avoid the imposition of criminal penalties. <u>Id.</u>

Commonwealth's legislature intended as much.  See Boschette v. Bach, 925 F. Supp. 100, 103 (D.P.R. 1996) (Pieras, Jr., J.).

Importantly, the statutory scheme in which section 173 is found envisions a criminal enforcement mechanism, as it makes violation of any of the time and manner of payment provisions a misdemeanor.  See P.R. Laws Ann. tit. 29, § 177 ("Violation of any of the provisions §§ 171-177 of this title shall constitute a misdemeanor.").  This suggests that the provisions' drafters did not intend for the courts to imply a private cause of action.  See Allco, 875 F.3d at 70.

The Plaintiffs argue that there are cases in which Puerto Rican courts have recognized an implied right of action in section 174, which is covered by the same misdemeanor enforcement provision as section 173.  Pls.' Mot. Recons. 17. The case they cite for this proposition, however, does not make any reference to this statutory scheme; rather, it consists of an analysis of the related issue of whether an employer may intervene to oppose an attachment on a defendant employee's future wages to satisfy a plaintiff's judgment.  See Rodríguez Velázquez v. Fontes Cátala, 51 P.R. 648, 650-51 (1937).

In 1961, Puerto Rico enacted a statute that reaffirmed and revised the regulations governing a summary procedure for suits brought by employees seeking compensation for services rendered. See P.R. Laws Ann. tit. 32, §§ 3118-3132; see also Act No. 10 of

Nov. 14, 1917, P.R. Laws Ann. tit. 32, §§ 3101-3113 (repealed 1961); <u>Dorado Beach Corp.</u> v. <u>Superior Court</u>, 92 P.R. 594, 598 & n.3 (1965) (acknowledging that Act No. 2 of October 17, 1961 revised the procedural rules governing claims for unpaid wages). The fact that this statute and its precursor clearly contemplate private suits by employees seeking unpaid wages could suggest that section 173 does imply a private right of action.

Indeed, in <u>Secretary of Labor</u> v. <u>Vélez</u>, the Supreme Court of Puerto Rico reviewed a lower court adjudication of an employee's claim of unpaid wages bought pursuant to the precursor of sections 3118 through 3132's procedures. 86 P.R. 555, 558-59, 564-65 (1962). Sections 271 through 288 of title 29 of the Annotated Laws of Puerto Rico provided the statutory basis for the plaintiff's suit. <u>See id.</u> at 557. Found in the same title (governing labor protections) as section 173, sections 271 through 288 impose general labor rules on employers, including establishing an eight-hour workday and requiring employers pay extra for overtime work. Also, as in section 173, employer violations of the provisions in sections 271 through 288 can beget misdemeanor liability. <u>See</u> P.R. Laws Ann. tit. 29, §§ 287, 290, 292. All this would seem to suggest that the statutory scheme in sections 171 through 177 is like that in sections 271 through 288, and thus that if the Puerto

Rico Supreme Court recognized a private cause of action under the latter section, it would find one in the former, too.

This reasoning would prevail were it not for a provision in title 29's section 282 that provides _explicitly_ for a private cause of action for individuals to enforce their rights under sections 271 through 288 pursuant to the procedure established by title 32, sections 3118 through 3132. See P.R. Laws Ann. tit. 29, § 282 ("Any employee who receives a compensation less than that fixed by §§ 271-288 . . . shall be entitled to recover from his employer, through civil action, the sums unpaid . . . .").  The Puerto Rico Supreme Court's decision in Vélez buttresses reading section 282 to exclude a private cause of action under section 173, which stipulates no such thing, because the decision references section 173 only to invalidate the employer's potential defense that the employee had received daily meals and lodging.  See 86 P.R. at 564-65.

The Plaintiffs suggest that the Court ought interpret sections 171 through 177 to permit a private right of action because section 174 contemplates "an action brought by a laborer against an employer for any amount due him" when it prohibits the employer from bringing a counter claim in such an action. Compl. ¶ 180.  The fact that section 174 contemplates lawsuits for unpaid wages does not lead to the ineluctable conclusion that sections 171-177 establish the statutory authorization for

such cases, however.  In light of section 282's explicit authorization of private civil suits for unpaid wages pursuant to sections 271-288, the Court does not find the Plaintiffs' section 174 argument persuasive.  The Court understands section 174 as merely limiting a defendant's permissible responses to an action brought pursuant to section 282.

Concluding on the reasoning above that section 173 does not create a private right of action to impose liability on employers for unpaid wages, this Court granted ECO IQ's motion to dismiss count IV.  See Boschette, 925 F. Supp. at 103 ("We may, perhaps, be unadventurous in our interpretation of [state] law, but a plaintiff who seeks out a federal venue . . . should anticipate no more." (quoting Porter v. Nutter, 913 F.2d 37, 41 (1st Cir. 1990))).  Moreover, concluding -- as this Court does -- that no such cause of action exists, the Court also dismisses count IV as to all other Defendants, noting that the defect identified could not be cured by amending the complaint. See Clorox Co. P.R. v. Proctor & Gamble Commercial Co., 228 F.3d 24, 30-32 (1st Cir. 2000) (recognizing that sua sponte dismissal of a claim without notice is permissible when an amendment could not cure the claim's flaws) (citing Wyatt v. City of Bos., 35 F.3d 13, 15 n.1 (1st Cir. 1994)).

## VII. BREACH OF THE PER DIEM AGREEMENT

Only Guthrie and ECO IQ moved to dismiss this count. Guthrie argues that if he signed the Per Diem Agreement, he did so on behalf of J&W and not in his personal capacity.  J&W Mot. 12-13.  He thus suggests that the Plaintiffs cannot reach him without piercing the corporate veil and insists that the complaint does not make a sufficient showing to do so.  Id.  The Plaintiffs posit that their complaint adequately alleges alter ego liability via veil piercing.  Pls.' Opp'n Mot. J&W 13-14. ECO IQ suggests that its absence from the Subcontractor Agreement attached to the complaint absolves it from liability. ECO IQ Mot. 22.

The Plaintiffs correctly note that they have pled enough to establish a veil-piercing claim against Guthrie.  See, e.g., Compl. ¶¶ 34-35, 80, 89, 90.  "[N]either the Puerto Rican courts nor the Puerto Rican legislature has thoroughly addressed the question of what law must apply to piercing the corporate veil." TC Invs., Corp. v. Becker, 733 F. Supp. 2d 266, 278 (D.P.R. 2010) (Besosa, J.) (quoting Wadsworth, Inc. v. Schwarz-Nin, 951 F. Supp. 314, 320 (D.P.R. 1996) (Pieras, J.)).  The parties appear to rely on Puerto Rico law.  See J&W Mot. 12 & n.13; see generally Pls.' Opp'n Mot. J&W (neither citing any particular law nor controverting the Defendants' citation to Puerto Rico law).

The Plaintiffs may overcome Puerto Rican law's presumption of corporate separateness where they allege that (1) the owner of a corporation's level of control renders the corporation "a mere shell" of the owner, and (2) "the corporation is being used to sanction fraud, provide injustice, evade obligations, defeat public policy, justify inequity, protect fraud or defend crime." Milan v. Centennial Commc'ns Corp., 500 F. Supp. 2d 14, 26 (D.P.R. 2007) (Gelpí, J.) (citing Fleming v. Toa Alta Dev. Corp., 96 P.R. 234, 237 (1968); Escude Cruz v. Ortho Pharm. Corp., 619 F.2d 902, 905 (1st Cir. 1980); Garcia Colon v. Garcia Rinaldi, Civ. A. No. 01-1571, 2006 WL 3421862, at *6 (D.P.R. Nov. 28, 2006) (Dominguez, J.)). Here, the complaint alleges that Guthrie owns J&W and that he is heavily involved with J&W's day-to-day operations, especially regarding the alleged misconduct, which includes a count of fraud. See, e.g., Compl. ¶¶ 34-35, 60, 80, 89, 90, 220-32; see also Satellite Broad. Cable, Inc. v. Telefonica de Espana, 786 F. Supp. 1089, 1100 (D.P.R.) (allowing complaint against parent company to proceed when it simply alleged that a parent company negotiated a deal then caused its subsidiary to sign it), modified on recons. on other grounds 807 F. Supp. 210 (D.P.R. 1992) (Pérez-Giménez,

J.).  Consequently, the complaint states a plausible claim for piercing the corporate veil.[19]

ECO IQ protests that the complaint fails to allege that it signed the Subcontractor Agreement.  ECO IQ Mot. 21-22 (citing Compl. Ex. A).  The complaint does allege, however, that ECO IQ agreed to pay the Plaintiffs a per diem and does not allege that the Subcontractor Agreement is the only basis for ECO IQ's promise to pay.  See Compl. ¶¶ 201, 223.  ECO IQ cites no authority for the proposition that the Plaintiffs had to produce evidence of the agreement itself.  See ECO IQ Mot. 22 (citing no authority).  As such, the Plaintiffs plausibly allege that ECO IQ breached an agreement to pay them a per diem.

## VIII.    BREACH OF RENTAL AGREEMENT

In count IX, the Plaintiffs allege that J&W and the Technology Defendants breached the Equipment Rental Agreement. Compl. ¶¶ 205-14.  The Court dismissed this count against all of the Technology Defendants as the Plaintiffs fail to allege plausibly that the Technology Defendants were parties to this agreement.[20]

---

[19] The Court made its ruling on January 8, 2019, ECF No. 160.  Guthrie did not seek bankruptcy protection until January 23, 2019, ECF No. 165.  It is, therefore, appropriate for this Court to explain its reasoning in this memorandum.

[20] In their motion for reconsideration, the Plaintiffs point out that Migo IQ did not specifically seek dismissal of count IX.  See Pls.' Mot. Recons. 17.  In its motion to dismiss all of

The Equipment Rental Agreement[21] lists only J&W and the Plaintiffs as parties. <u>See</u> Equipment Rental Agreement. The Complaint nonetheless alleges that the Technology Defendants "manifested an intent to be bound" by the Equipment Rental Agreement. <u>See</u> Compl. ¶ 206. This allegation does not hold water, whether Puerto Rico law or Virginia law (to which the parties agreed in the Equipment Rental Agreement) applies. <u>See</u> Equipment Rental Agreement ¶ 24.

In Puerto Rico, "[t]here is no contract unless . . . the consent of the contracting parties" exists. P.R. Laws Ann. tit. 31, § 3391. "Consent is shown by the concurrence of the offer and acceptance of the thing and the cause which are to constitute the contract." <u>Id.</u> § 3401. Puerto Rico law further requires a "meeting of the minds as to the terms agreed upon." <u>Bianchi-Montaña</u> v. <u>Crucci-Silva</u>, 720 F. Supp. 2d 159, 165 (D.P.R. 2010) (Besosa, J.) (citation omitted). Virginia law is similar; it requires a "meeting of the minds," which in turn

_____

the counts against it, however, Migo IQ did point the Court's attention to the fact that count IX alleges breach of a contract to which none of the Technology Defendants are parties. <u>See</u> Migo IQ Mot. 11.

[21] While there are a series of individual Equipment Rental Agreements between J&W and the individual plaintiffs (or corporate entities created in their names), the Court refers to the Rental Agreement as singular because the Plaintiffs aver that the terms of all of these agreements are substantially similar. Compl. ¶¶ 67-69.

"requires a _manifestation_ of mutual assent."  Wells v. Weston,

326 S.E.2d 672, 676 (Va. 1985).

Here, the Plaintiffs make no effort to show that they

agreed with any of the Technology Defendants on the contract's

terms.  See generally Compl.  Instead, they indicate instances

in which the Technology Defendants benefitted from the Equipment

Rental Agreement, such as through installing "GPS and load

tracking devices in Plaintiffs' vehicles."  Id. ¶ 82.  They do

not allege that any of the Technology Defendants signed the

Equipment Rental Agreement, that they paid the Plaintiffs under

it, or even that the Technology Defendants were aware of it.

See id. ¶ 98.  As such, they fail to allege that the Technology

Defendants were parties to the Equipment Rental Agreement.  The

Court dismissed this count against all of them for this reason.

## IX.  UNJUST ENRICHMENT

Guthrie suggests that the Plaintiffs must pierce the

corporate veil in order to show his liability for unjust

enrichment.  J&W Mot. 11.  As described above, the Plaintiffs

have alleged enough to move forward on a veil-piercing theory.

ECO IQ contends that the complaint fails to provide enough facts

to make out an unjust enrichment claim against it.  ECO IQ Mot.

24-25.

The complaint states a claim for unjust enrichment against

ECO IQ:

To prove a claim for unjust enrichment under Puerto Rico law, "[t]he following requirements must be present: (1) existence of enrichment; (2) a correlative loss; (3) nexus between loss and enrichment; (4) lack of cause for enrichment; and (5) absence of a legal precept excluding application of enrichment without cause."

Montalvo v. LT's Benjamin Records, Inc., 56 F. Supp. 3d 121, 136 (D.P.R. 2014) (Gelpí, J.) (alteration in original) (quoting Hatton v. Municipality of Ponce, 134 P.R. Dec. 1001 (1994)). Here, the Plaintiffs allege that ECO IQ benefitted from their labors on the Project through contract funding and advertising on their trucks. See Compl. ¶¶ 81, 84-90. Notwithstanding these efforts, ECO IQ did not pay the Plaintiffs in full. Id. ¶¶ 93-94. As a result, the complaint establishes a plausible unjust enrichment claim against ECO IQ.

**X.    FRAUDULENT INDUCEMENT**

The Court granted ECO IQ's motion for judgment on the pleadings on the fraudulent inducement claim because the Plaintiffs fail to allege any facts showing that ECO IQ "deliberately induced Plaintiffs to travel to Puerto Rico to work for them and that they promised to pay Plaintiffs for their work and for the lease of their property." ECO IQ Mot. 24-25.

The Plaintiffs allege that the Defendants fraudulently induced them to accept employment. See Compl. ¶ 224 ("Defendants knew or should have known that these representations [about the debris-removal job] were false and

made them with the intention that Plaintiffs act upon said representations.").

While there is some evidence that the J&W Defendants induced the Plaintiffs to Puerto Rico for work on the Project, the complaint attempts to bootstrap all the Defendants by stating that they acted "through" Guthrie.  See Compl. ¶¶ 222-23, 226, 227.  Such an allegation as to ECO IQ is conclusory and without any basis in other facts asserted.  As such, the Court granted judgment on the pleadings for ECO IQ on this claim.

## XI.   CONVERSION

The Court likewise granted ECO IQ's motion for judgment on the pleadings as to the conversion claim as the complaint is bereft of allegations that ECO IQ specifically exercised control over the Plaintiffs' equipment.  See generally id.  Instead, the complaint offers conclusory allegations such as that "Defendants, and each of them, illegally exercised and assumed authority" over the Plaintiffs' equipment.  Id. ¶ 236.  These allegations are insufficient to plead conversion.

## XII. CONCLUSION

For the reasons set out above, the Court dismissed count II as to Cloud IQ, Mojo, Neilitz, Synergy, Guthrie, and Rivero; count IV as to all of the Defendants; count VI as to Cloud IQ, Mojo, and Synergy; count IX as to ECO IQ, Cloud IQ, Mojo, Migo IQ, Radar_Apps, and Synergy; and counts XI and XII as to ECO IQ.

count II remains pending against ECO IQ, Migo IQ, Radar_Apps, Kotthoff, and Leese, as does count VI as to ECO IQ, Migo IQ, and Radar_Apps.  Counts XI and XII remain pending against Guthrie (albeit stayed), Cloud IQ, Mojo, Neilitz, Synergy, Rivero, Migo IQ, Radar_Apps, Kotthoff, and Leese.  Counts I, III, V, VII, VIII, and X remain alive as to all of the Defendants against whom they were brought (although proceedings are stayed with regards to the claims against the J&W Defendants).

     **SO ORDERED.**

/s/ William G. Young
WILLIAM G. YOUNG
DISTRICT JUDGE
